v. Richard J. Konow, Defendant Hunt v. Brian T. Bain, Defendant Hunt v. Robert J. Knax Mr. Metz, if you are ready to proceed. Good morning. My name is Robert Metz. I'm here representing the Defendant Appellant of Richard Konow. This matter comes before you on my appeal of the trial court's decision, particularly with regard to a defense of accord and satisfaction. That's the primary issue here for my appeal. Going right into the argument as far as the standard of review, I have cited a 2nd District case, AFP Enterprises v. Crescent Park. And I mainly cited that case as it cited the Quaintance Association Inc. case v. PLM Inc. case, which is a 1st District 81 case. And in that case it indicated that if there's no substantial dispute as to the facts that surround the issue of accord and satisfaction, that that issue can be determined as a matter of law. And I would submit to you with regard to the record of the trial in this case that there is no substantial issue of facts, of the core facts related to the issue here of accord and satisfaction. And so that's why I cited that case. And I suspect that you'll consider that that is what I'm saying is the standard of review here. As to the facts that the plaintiff did tender at the trial in this case and before on this issue, she argued that the draft was never presented to her, which is true. It was never presented before it was cashed. Her testimony indicated it was presented to Transback, which we tendered it to plaintiff's counsel after a letter setting forth all the lien claims had been resolved. Setting forth how we should transmit payment of the settlement amounts. That letter indicated that auto owners had settled their lien claims with the plaintiff's attorney for a stated sum. So a check was then generated by West Bend, and that check was then sent to plaintiff's attorney, who in turn then sent that draft to Transback Solutions. Transback Solutions is an agent of auto owners, and per the stipulation that we had at the trial in this case, and prior to that for the arbitration as well, they had authority, full authority to negotiate and cash settlement checks for the segregation rights of auto owners in this case and other cases. Now, counsel, for there to be a court of satisfaction, there are a couple factors that are required. One, there has to be an honest dispute as to an amount due. A tender with the understanding that it is in full payment of all demands that were made and has to be in good faith. And then acceptance and negotiation of a check with notice of the condition under which the check was tendered. Looking for a minute at the first factor, was there an honest dispute between auto owners and Konow about the property damage subrogation claim? I submit there is, Your Honor, and the reason is- Okay. Sorry. If you can elaborate on that. Sure. There was testimony by all three attorneys at the trial in this case as to the standard practice after a settlement or after a trial in the case involving personal injury and property damage where there's liens and so forth, or in this case, subrogation rights. And the testimony was that it's standard and customary that those liens are often negotiated under the threat that there may be at some point a petition to adjudicate and lower those liens. But in this case, in fact, there was negotiation, and the evidence is clear that there was ongoing negotiation. Initially, we know that Mr. Sovereign negotiated at least one of the liens, as the evidence eventually showed in the case. He settled for less than one of the liens. And we also know by the evidence of Ms. Bailey herself and Mr. Fenis and Mr. Sovereign, all testified at the trial in this case to that customary practice of negotiating liens. Mr. Sovereign- But what were they fighting about, the amount? I mean, there was an agreement that it had been- I'm sorry. The car was towed, right? So- Yes. So liability, was that the issue? Or damages? Not really. I mean, so what-  Really, what was the dispute about? I know there- Well, we had one- We were just talking about some negotiation and trying to, quote, settle it. But there had been reimbursement for the $28,000, correct? We had one pot here of $2 million. Right. And that was for everything. This gentleman had extremely serious injuries. And as a result of that, obviously, the vast majority of the pot was- Right. There was no dispute about the medical aspect. Right. But- This was a part of that pot. So you had to settle, you know, you had to come to an agreement on that and the personal injury claim and the medical payments and any other lien that was involved. There was, I think, a number of other liens that were listed in that letter. So as a result of that, there was negotiation as to what- In fact, the letter from Plaintiff's Counsel, Exhibit 9 at the trial, and this is even after the check was submitted, offered for the $28,000, offered to settle the matter for $19,000 and some odd dollars. That's Exhibit 9. And I believe the letter even she sent before that even offered to negotiate October 16th letter. I believe that was offered to negotiate it as well. And in fact, there was negotiations that had gone on for- The MedPay lien was actually in the same category, I would assume, as the lien with regard to the claim for property damages in terms of it was initially a stated amount, an amount that was actually paid by the insurance company. But it was in fact negotiated down and the evidence in this case clearly shows that there was negotiation going on with regard to the other liens as well. But was that the $3,300, whatever that figure was, included in the $19,000 negotiated? Well, our position was, and this is based upon the letter that we received from Mr. Sauber, that we were informed by Mr. Sauber that he settled all claims, meaning both, it was only two claims. He settled both claims with the insurance company for the $3,333. As a result of that, we tendered a check, and the check had a condition on it, to Mr. Sauber with his clients on it so they can sign off that they had the agreement on that with all claims. And then he had turned forward a bail on. Now, that check clearly had on its face that this is for payment of any and all claims, not just the payments. But you did have, you did know of, a $28,000 judgment that there was discussion about reducing or coming to a negotiated resolve that didn't appear anywhere. Was there any question raised about that other than by Ms. Bailey? Well, when you say it didn't appear anywhere, I mean, I believe, and this was not my case at the time, Mr. Fenis, Judge Fenis had the case at that time, was told by a letter. He was aware, would have had to have been aware by the fact of the complaint itself that Mr. Sauber filed by his client and actually asked for property damage. So he was aware that there was that aspect of the claim. But then he was also made aware by that letter that was tendered to him that that claim was settled, along with the other claim. That's the understanding, the import to that letter was that he settled all claims, including that claim. So that prompted the letter, or that prompted the check to be sent. But now the amount of that check really represents, what, $0.12 on the dollar? I mean, how can that be viewed as a good faith offer of settlement? I mean, again, if we're looking at these aspects of accord and satisfaction. Well, I guess I would say two things to that. One is the good faith part of it was the fact initially that it was represented to him that that was the settlement by plaintiff's attorney, which, again, was a custom and practice for the plaintiff's attorney to negotiate all liens. And he said that it was all liens. And then secondly, I mean, he placed on the draft itself, secondly, he placed on the draft itself the language that, you know, full and final settlement, which certainly gave the opportunity for them to refuse it if that was not the case. And thirdly, he actually, the evidence in the case, at the trial in the case, showed that Mr. Phoenix actually had a conversation after the settlement draft had been tendered, around the time of the October 21st letter. He had a conversation with Ms. Bailey, at which time he advised her that it was the intent of that trial. It was the intent of the draft to pay for both of those claims. That October 21st letter was about approximately five days before she then told Transpac to go ahead and cash that check. So in terms of the good faith, I would submit that his good faith was that he tendered it in response to a representation made by Mr. Sauber. And that was, in fact, followed up with an actual communication with the plaintiff's counsel after the draft had been tendered. But they were aware of auto owners having intervened in the underlying suit and the amount that was being claimed there as due, correct? That pleading, we would be unnoticed. Absolutely, we would be unnoticed whatever that pleading was filed. There was an intervening complaint filed in that case, and so- Prior to your subrogation, so- Sure. Mr. Sauber would have been aware of it, and we would have been aware of it by virtue of the filing, absolutely. With regard to, well, beneath the elements, they're codified in the UCC at 810 ILCS 53311. We've kind of gone over the bona fide dispute aspect of it. Well, whose claim was Mr. Conow settling? Mr. Bettex's claim, right? He was settling Mr. Bettex's claim, but he also was representing, and as per the custom and practice as testified to by the three attorneys in this case, he was also negotiating the liens that had been served on us and to Bettex that had to be covered out of that settlement money. So that included not just the auto owner's claim, but it included other claims as well. I think the- Medical claims. Yeah, there were other medical claims. There was a list of them, one of which I think was identified in the trial, Exhibit 6, listed them all out. And the standard practice was for the attorney-the standard practice was the attorney for the plaintiff typically, because it's his client's providers, would contact his own client's providers and say, hey, you know, will you take X amount to settle this case? And he was allowed to take a certain amount off of creating a fund under the fund doctrine for those medical claims, but those sometimes are negotiated down further as well. So typical practice was he was negotiating those claims, and then he would represent to us, the defendant, here's the amounts I settled these claims for, and then to make a-like he did in this case, make a request for a list of settlement drafts, which included all the lien holders, and then the balance check would go to the plaintiff and his attorney. But that was really for convenience's sake. It was for convenience's sake, but it was also to let us know this is what amounts will cover the liens and satisfy the liens so that the lien holder won't go after you. But there were no direct negotiations between Konau's attorney and auto owners, right? That's correct. Mr. Phoenix relied upon Mr. Sauber to negotiate with his client's own providers. As was typical. Which was customer practice. And while it was typical, is there any reason that Mr. Phoenix could not have questioned it directly, or would that have been such a, you know, directly with auto owners, or would that have been such a breach of protocol that it would be unthought of? No, no, it would not. Mr. Phoenix could have asked for some documentation from auto owners and from other providers saying, you know, here's what I accept for settlement. In this case, for whatever reason, he didn't do that. But in not doing that, he then had a check presented that said this is a full and final payment and satisfaction of our agreement. So he covered it in that fashion. Well, it also said all rights are reserved. That was not on there? That was not on the check. It was part of the endorsement. It was part of the endorsement. It wasn't while it was tendered. And the part of it that's the tender of payment with understanding, explicit understanding that it's a full payment of all demands, I cited the Winslow case for the fact that intent can be from the conduct of the parties. The words that were discussed, and when I say the words, what was discussed, that includes the conversation that Mr. Phoenix had around October 21st, advising what the check was about. And then, of course, the language itself. The case law that we cited refers to the fact of there being a conspicuous language on the check itself. And I don't think there's any dispute here that the language was prominent, was conspicuous. It was stipulated to, and the check said on both sides, on the back, it said a full and final settlement of any and all claims. On the front, it said a payment of final settlement. So that part was obvious. I don't think there could be any misunderstanding or misconstruing that. Well, what was the effect in the import of all rights reserved as part of the endorsement then? I believe the case law says, and I cited the Shea case, you can't change a condition as that. The Shea case involved sort of similar facts. There was kind of similar language on the check itself that was tendered that says, this is for everything, full and final payment type of language. And the other party tried to change that language or cross it out, and that court essentially said you can't do that. If it's tendered with that condition, your choices are either two choices. You either have to accept it or reject it. Those are the only choices. You can't change it. And the same goes for putting a restrictive endorsement on it. So that would be all rights reserved? Yes. Wouldn't these be considered a change? You can't do it. So you have a choice, either accept it or reject it. Is that my time? You'll have a chance for a response if you so choose. Thank you. Thank you very much. Mr. Bailey? Good morning. May it please the Court? My name is Brian Bailey. I represent an auto owner's insurance company in this matter. Many times someone tries to rewrite history, and there's always a problem with that. You see the flaws and the inconsistencies that arise, and that is exactly what happened in this particular case. This accord and satisfaction defense, which was brought up over three years after the check was cashed, is just a last-minute ad hoc attempt to try to get out a payment that should be made. Justice Enoff, you did raise the standards that are the elements of what needs to be proved to assert a defense or prove an affirmative defense of accord and satisfaction. And the oberva is on the defendant in this particular case. And you will see that for three particular reasons, the accord and satisfaction defense fails here. Well, first let me just ask, though. The language on the check was black and white. We just talked about what it said. The fact of the matter is auto owners cashed the check or its agent cashed the check. How do you get around that? Well, there's a long and tortured history before that happened. As you know, as this panel knows, this case had been pending for quite a bit of time before that all happened. Right. I think we're aware of the procedural history. We had a complaint on file on behalf of auto owners. We had counsel of record in that case, which were totally ignored. Totally ignored throughout this settlement. There was a release that was signed. Nothing in there about auto owners. Nothing in there about auto owners' claims. All that happens is a check gets sent not to auto owners. Nobody talks to auto owners about settling their claims. A check gets sent to a plaintiff's counsel, without ever speaking to auto owners, who then ignores auto owners' counsel of record and sends the check to a third-party subrogation vendor down in Kentucky and says, here's a $3,333 check. Now, with respect to the check itself, as Judge Grady pointed out on the record at page 90, the check is ambiguous on its face. And ambiguities, as this Court has stated before, ambiguities in an instrument are construed against the drafter. And when I say an ambiguity, here's what the check shows, if you look at it. It says it's payable to Eric B. Tugg, his wife, and auto owners' insurance company. It is signed by auto owners' insurance company, or by Transpac Solutions. It's signed by Eric B. Tugg, and it's signed by Eric B. Tugg's wife. Now, we know in the trial system. They endorsed it. They endorsed it. Not to auto owners. Correct. They endorsed it. Okay. Under the same language that auto owners endorsed it. Yet that didn't apply. In their scenario, that endorsement doesn't apply to the B-Tucks. It only applies to auto owners. So they want to pick and choose who it applies to, because we know that the B-Tucks got over $2 million more in money. So the check is ambiguous, and there was no, you know, they couldn't easily. I'm sorry, I've missed. Why is it ambiguous? Because it only applied to certain payees on the check. You know, it didn't apply to the B-Tucks. The B-Tucks signed off the exact same check, the exact same language. They were listed as a payee on that check. Okay, but it's not the B-Tucks' claim we're talking about here. It's auto owners'. The check doesn't say whose claim or what the claim was for. It's just a check for 33. Well, why would they have endorsed the check to auto owners if it weren't for payment of auto owners' segregation claim? It wasn't endorsed over to auto owners'. It was endorsed by them. It was endorsed by the three payees in consent to auto owners'. It doesn't say, you know, pay to the auto owners or pay to the, you know, there's no endorsement like that. They just sign off on the back of the check, just like auto owners did. Yet, under everybody's scenario, the endorsement only applies, I mean, the cordon de satisfaction language only applies to auto owners. It doesn't apply to the B-Tucks. Judge Brady specifically pointed out, there was a question I raised during the trial, and counsel objected and said, wait a second, you're saying there's two different, your question is ambiguous because you're saying there's two different meanings that could be gotten from this check. And Judge Brady, at page 90, says precisely. That check is ambiguous on its face. And I think if you look, you'll see that in the record at page 90. So the check on its face is ambiguous. One of the things they need to prove is there was a mutual intent here for that check to satisfy all of auto owners' claims. There was no testimony. Despite the fact they could have brought in an adjuster from West Bend, they could have brought in someone to testify as to what the intent of West Bend was when they sent that check. There was no testimony whatsoever. All they're relying upon is that check and saying, that check is the sole reason why you should find that there was mutual intent here. And the check is ambiguous, we submit. So what's the effect of cashing that check then? It settled the medical payments claim, which it clearly did. The medical payments claim was $5,000. And as this court well knows, under the common fund, we have to pay a one-third fee, which takes the check down to $33,33,33. That's common knowledge. Now, with respect to counsel's argument that, well, during the course, it's customary that we let the plaintiff's attorney settle case, settle liens and things of that nature. This is not a typical case. This was a case where auto owners had their own complaint on file, had their own counsel in the case, appearing at the hearings. This was not a case where some medical provider was just sitting back waiting to see if, you know, waiting to see if someday they would get paid. This is a case where auto owners was there litigating its own claims. So it's not a typical, well, we just relied upon Mr. Sauber to resolve all the liens. That's the problem here. The problem here is that the defendant relied upon someone other than the person they were supposedly settling the claim with. Did Mr. Sauber have any communication with the attorney for, let's see, auto owner? Not at all. Not at all. It was afterward, you'll see from in the record, and Mr. Metz pointed out a couple of these things, which is on page 90, C94 of the record, there is a fax that goes from Mrs. Bailey to Mr. Sauber that says, hey, you know what, we understand you got the $3 million. We're willing to give you a one-third off. Again, under the common fund, you got the $3 million. We're willing to give you a third off and only take $19,000, $8,000, and 25 cents. That in turn got a call from Mr. Sauber, and the record shows that he said, no, no, no, no, no. I didn't settle your property damage claim. The property damage claim did not belong to me, and I had nothing to do with the property damage claim. That's Mr. Sauber's own words. But then the check was never returned. The check was not returned. Oh, I'm sorry. I'm sorry. So after Conow made it clear that, or his attorney, that they intended it to settle all of the claims, the check was cashed, not returned. That's correct. The check was cashed. But the fax where Mr. Sauber said, I'm not paying you, and I'm not giving you any of the money that we got, I'm only in response to that October 21st, 2009 fax. Mrs. Bailey then wrote a letter to both counsel. I'm sorry. That was October 16th fax. On October 21st, she writes a letter to both of them saying, wait a second here. You've got to explain all this to me. I've been left in the dark here. I don't understand what you're settling. My understanding is this is a settlement for the medical payments, and my claim for property damage still stands. I'm not giving you a third off anymore, and I want my full payment back. That got no response whatsoever. Counsel could have called and said, no, no, no, no, wait a second. We settled all your claims. Nobody responded at all. And at that point, Transpac had not cashed the check. It was still several days before Transpac cashed the check. And with respect to the check, another big problem is the check was sent, again, to Transpac Solutions, not to counsel. The record shows counsel did not see the back of that check with that restrictive language for over a year after it was submitted. But Transpac was its agent. It was the auto owner's agent, was it not? That's correct. It was authorized to cash the check and act as it did. But if the parties had followed the code of professional responsibility, auto owners had counseled the record. Auto owners were represented in the case, and they ignored that fact. They ignored it. Because if that check had been sent directly to Ms. Bailey, she might have seen that restrictive language and said don't cash it. But they ignored the code of professional responsibility and just went ahead and sidetracked counsel's record in the case. In talking about the code of responsibility, was there anything preventing auto owners to directly contact West Bend to deal with this issue? Other than I understand that you didn't know about the issue for a year. But once the issue became clear, was there any reason that auto owners could not go directly to West Bend? Well, by the time that happened, I believe the case was already dismissed. We were probably already up here in the appellate court at that point in time. And the Actual Accord and Satisfaction offense was not raised for another, I think, two years after that was the first time it was raised. So there was no reason to believe it. It was always under auto owners' understanding that the 3333 represented two-thirds of the MedPay claim, which it certainly does. It certainly computes that way. So we believe, A, that there was no mutual intent between the parties. And for that reason alone, the Accord and Satisfaction offense fails. Now, we also believe that there was no dispute with respect to the amount at issue. Now, counsel says, well, it's customer practice that afterwards sometimes liens are negotiated. Again, there was no—we were a counsel of record in the case. There was no contact with us. There was nothing in the record, and I defy anyone to show it, whether there was an interrogatory question, whether there was anything in a pleading, anything challenging the amount of auto owners' claim for property damage. There is absolutely nothing. In fact, at the trial, Juliana Guzman, who was an adjuster for auto owners' insurance company, testified. There was not one question posed to her contesting or questioning the amount at issue. So we believe that there was never any bona fide dispute as to the amount, and therefore, on that second ground, the Accord and Satisfaction defense fails. Even if you—even if this Court were to find that the Accord and Satisfaction defense does apply, we believe that it was barred by laches. And in order to show laches, we have to prove that the litigant exhibited an unreasonable delay in asserting the defense and that the opposing party suffered prejudice as a result of that delay. But now, you never raised this laches argument prior to this, even though this case has had, as you said, a very long history, including arbitration, a trial, a number of things. This wasn't ever raised before. Well, it's interesting you note that, Your Honor, because the first time this—the Accord and Satisfaction defense was raised was on November—oh, I'm sorry, September 27th of 2012, when counsel filed a joint—or a motion—filed two motions, a motion for summary judgment and a motion for the—to file this affirmative defense. On October 16th, 2012, approximately two weeks later, and you'll see it if you look on the record at page 79, we did raise the fact that this was an untimely defense and that we had a problem with that. So it was raised early. It was raised in our trial brief. It was raised throughout our trial brief. So it was not that this was something raised at the last second. It had been raised before. With respect to that particular claim, clearly—I mean, if you look at the facts, this Accord and Satisfaction defense was not raised for the first time, like I said, until September 27th of 2012. The check that they rely upon to claim there was an Accord and Satisfaction was cashed by Transpac Solutions on October 26th of 2009, approximately three years earlier. The—and after that, there were two motions of dismissal filed by defense counsel in the first case. There was an appeal in the first case. There was a second case, this case. This—there was an answer filed. Nothing was raised there. It wasn't until nine months after the answer was filed in this particular case and three years after the check was cashed that, for the first time, they raised this affirmative defense of Accord and Satisfaction. Now, with respect to did we—were we prejudiced by that, because that was an issue in the first case. Did we suffer any prejudice? And I think the—this whole second case shows you the prejudice that we suffered. A, had they raised that defense in the first case, they knew it for over almost a year, maybe more, before that first case was dismissed that we had cashed that check. Had they raised that in the first case, that could have all been dealt with at this appellate court when the first appeal. It was not raised, and therefore, we had to file the second case. We waited, and now we're back here again. And in the first case, we were told, well, you can't get the judgment against Mr. Vitoc because you may still have a claim against Mr. Kanawha, and you need to bring that case against Mr. Kanawha, which we did. Now we're being told by Mr. Kanawha, long after the fact, sorry, you don't have any claim against us because you cashed the check. So we—did we suffer prejudice? We certainly suffered prejudice. Well, what about the aspect of—what about the fact that this is an action at law and not in equity? Does that just apply or not apply? Well, I think if you look at the Leshever v. Zion Benton Township High School case, there is language citing the bill case which says that's the traditional rule, but the traditional rule is not being followed anymore. So it doesn't—it says right in that case that it is not being applied to actions at law. So it's not just limited to actions in equity. So we think on that second ground, because of the late—the three-year delay in bringing this defense, that on that separate ground, the accord and satisfaction claim fails. And thirdly, we believe that the check itself should have never been admitted into evidence at the trial. Now, counsel states that there was a stipulation that was entered into by the parties that allowed for the admission of that document. If you look at that stipulation, first and foremost, it states on the document that it applies only to arbitration. Now, the document was read into the record, but there is nothing in that document that says that that check is admissible into evidence. We objected to it at trial, and we submit here that that check, without any evidence, without any testimony from anyone in the draft of that document, should have been admitted into evidence. But even if it had not been admitted, there could have been—well, somebody could have been called to testify. And they didn't. That's the problem. There was no evidence other than the check is the sole piece of evidence they rely upon for the support and satisfaction. If the check doesn't come in, then their whole claim fails. And so what—just since time is running, what is the actual relief that Auto Owners is looking for from us? Auto Owners wants this panel to affirm Judge Brady's ruling, finding judgment in favor of Auto Owners and against Mr. Knapp in the amount of $28,800.38. Okay. Thank you. Just one quick question. What was the basis, did you say, for your objection to admitting the check into evidence? There was no foundation laid for the admission. There was no business record except the testimony— The objection you made in the trial court? Yes. There was no testimony presented by anybody from West Bend as to that document. Thank you. Unless any of your honors have further questions? Thank you very much. Thank you. And now, Mr. Metz, if you wish, you may reply. Just very briefly. On the last thing he just said, he admitted that the stipulation that was in his response brief, but the stipulation was read into the record that stipulated to the check itself. And that was read into the record, and that's formed the basis of the judge ruling on allowing it in. Was the stipulation only for purposes of the arbitration or also for the trial? Well, initially it was for the arbitration. We had a conference before the trial. That's not part of the record here. But then, as of the day of the trial, you'll see on, I think it's pages six to nine, there was discussion held on it, and it was agreed that it was still the stipulation of the party. So I guess the issue of whether, really, if it was initially used for arbitration was moved because it was, in fact, read into the record right at the beginning of the trial in the case. Early on, he was talking about the professional responsibility with regard to the check and where it went and so forth. And my comment to that is Mr. Fiennes didn't control where the draft was sent. I'm sure he probably presumed that counsel was going to send it to counsel for auto owners in the case. That didn't happen. But he didn't control the check after it left his and went to the attorney for the plaintiff in the case. The plaintiff's attorney sent it directly to transpatch, the agent. But it had the three names. Yes, and I was going to get to that. That's the issue of his ambiguity that he's talking about. The thing that was testified to by the attorneys at the trial in this case is that at the same time that that check was sent with all his names on it, the rest of the checks, if he told them together, told him the $3 million were also sent at the same time to plaintiff's attorney. And again, that was custom and practice. According to Judge Fiennes' testimony, that was custom and practice at the time to include their names on it because they had just settled, the bettors had settled for $3 million. So having them sign off on that confirmed that, yes, they're in agreement that a portion of their money, $3 million, was being apportioned out to go, in this case, to auto owners to pay for lien subrogation interest that they had in the case. So their signing off on that also acted as an agreement that, yes, we settled for auto owners for this amount. And again, that was custom and practice. That's why it was done that way. I don't think that creates an ambiguity. It certainly, in the context of how it was sent, they were all sent that way for the rest of the lien holders. That's how it was done. And that's what Mr. Fiennes testified to. All right. It was sent to this Agent Transpac. Right. Is, again, was there a letter or any other CC sent to auto owners at that time? From Mr. Sauter? Or from Mr. Fiennes? Not from that. Well, from anybody, I guess, would be the issue. In terms of auto owners, I don't know. In terms of plaintiff's counsel. But they were on record, right? They were on record in this case? I agree. I agree that they were on record in the case. And, you know, Mr. Sauter, I would say, should have certainly sent it to. I agree. He should have sent it to counsel for auto owners in the case. It wasn't done. As soon as Mr. Fiennes learned of that, when he was contacted, he advised what the check was for. But how long was that then, when Mr. Fiennes was contacted? I think the checks, according to the draft, the check was issued on September 22. So we probably got it a day or so after that. Then they were transmitted to Attorney Sauter. I think there was actually a timeline established in the trial in this case. There was a receipt dated September 25th, where Mr. Sauter, that was Exhibit 7 of the trial, acknowledged receipt of all those drafts. And then I believe he testified that he sent them out. I'm sorry, I don't remember the exact date, but it was shortly after that. So there would have been a lag of a few weeks before that contact was made. She would have found out, Ms. Daly would have found out around the 16th of October of the check being sent, because in her testimony she said she was prompted by the computer entry that there was a check there around that time, thus her sending that first letter out October 16th. We can presume that's about the time the check was received, or shortly before that. And then the contact with Mr. Fiennes was certainly before the October 21st letter, because there was reference in that, I think it's Exhibit 7, there was reference to their conversation. So, again, I would just emphasize that that conversation that was had put them on notice, put Ms. Daly on notice, that that was the purpose of the check. Wouldn't there be an interest by counsel for Mr. Carnow to make sure that this is, since it had been taking so long and it had such a, well, maybe a tortured past, whatever we want to call it, that it was over once and for all? Wouldn't it make sense, even though it's custom and practice, that maybe we should follow up on something? Again, and I wasn't there for that portion of the case, Mr. Fiennes was, but it was my understanding early on that they were trying to get the money from the Veddix and Mr. Sauber, which is where the rest of the money went to. And, in fact, actually that's what happened. They ended up dismissing, they dismissed out Carnow at that point in time when they got the summary judgment grant to file a summary judgment against the Veddix and Sauber at that time. So it certainly wasn't an initial case. It wasn't a traditional case where there's a filing of a, as indicated, it wasn't traditional in the sense that it was a separate lawsuit filed by our office. It was a part of that case. It was customary. I mean, there's a lot of cases where lien holders come in and enter and intervene in the case. So, I mean, that wasn't too unusual. But in terms of having a problem that developed at the end of that case that we did, that was certainly unusual. At the only time I said latches, I would just, again, indicate that I think that's inequity. When he was referring to the cases that he referred to, I believe that, yes, latch use has now been used in cases where damages, law-type damages have been allowed, but it's been in conjunction with equitable remedy cases, too. I don't think there's any case law out there now that's just strictly a law case only. So I think that's limited there. On the other issue, I've cited a bunch of items in the comment, but there's a bunch of cases on labor that wasn't even touched on the issue of the timeliness. And also on the latches issue, I think in this case, really, we filed it, and it was the issue of the court of satisfaction was heard on the merits a number of times. It was heard in a summary judgment hearing. It was heard at the time of the arbitration hearing. There was a stipulation entered into, and it was defended at trial, all of which case there was no objection during the course of the trial or any of those other proceedings as to that not being an issue in the case. It was fought on its merits all the way through. So that's all I have. That's my only last comment. Thank you. Thanks for your time. All right, counsel, thank you for your arguments in the case. We will take the matter under advisement. We're going to be on a very short recess to reset for the next page in this particular book.